639 So.2d 1144 (1994)
STATE of Louisiana
v.
Lester JONES.
No. 94-KK-0459.
Supreme Court of Louisiana.
July 5, 1994.
Concurring Opinion July 21, 1994.
*1146 Numa V. Bertel, Dwight M. Doskey, Orleans Indigent Defender Program, for applicant.
Richard Ieyoub, Atty. Gen., Harry F. Connick, Dist. Atty., Mark D. Pethke, Asst. Dist. Atty., for respondent.
Ellis Paul Adams, Jr., amicus curiae for Louisiana Dist. Atty. Assn.
Denise LeBoeuf, Clive Adrian Stafford Smith, amicus curiae for Louisiana Crisis Asst. Center and Louisiana Death Penalty Res. Center.
John Michael Lawrence, Alan Jeffrey Golden, amicus curiae for Raymond Anthony Rawlins.
John Michael Lawrence, Kurt Joseph Goins, Alan Jeffrey Golden, amicus curiae for Brandon Haynes.
Concurring Opinion by Justice Kimball July 21, 1994.
ORTIQUE, Justice.[1]
The issue in the pretrial phase of this death penalty case is the constitutionality of LSA-C.Cr.P. art. 905.2(B), added to Louisiana's capital sentencing provisions by Act 436 of 1993.[2] The provision requires the trial court, during the sentencing phase of a capital trial, to instruct the jurors regarding the governor's power to grant a reprieve, pardon or commutation of sentence following conviction of a crime. Finding LSA-C.Cr.P. art. 905.2(B) in direct contravention to defendant's due process right to a fundamentally fair trial and to defendant's right to humane treatment, we declare it is unconstitutional.

I.
Defendant, Lester Jones, was indicted by an Orleans Parish Grand Jury on June 18, 1992 for the first degree murder of a British tourist, Julie Stott. The murder allegedly occurred in the French Quarter on the 1100 block of Rue Chartres during the perpetration or attempted perpetration of an armed robbery on April 14, 1992.[3]
Defendant filed a motion in limine on December 7, 1993. The motion moved to restrain the prosecution from mentioning in voir dire, opening statement or argument that the governor retains the power to pardon or commute a life sentence, and to have the trial court declare in advance of trial that it will not charge the jury regarding to the power of the governor or executive branch to pardon or commute a life sentence. Defendant's motion was denied.
Defendant applied directly to this court for supervisory relief from the denial of his motion. We stayed trial and transferred defendant's application to the Fourth Circuit Court of Appeal. State v. Jones, No. 94-KK-0459 (La. February 24, 1994). The appellate court granted defendant's application for review, but denied him relief. In Re: Lester Jones, No. 94-K-0310 (La.App. 4th Cir. February 18, 1994). Noting that defendant's pre-trial motion attacked the constitutionality of LSA-C.Cr.P. art. 905.2(B), as enacted by Act 436 of 1993, the appellate court *1147 declined to exercise its supervisory jurisdiction to provide an advisory opinion as to the conduct of the prosecutor during the guilt phase of trial and as to the jury instructions of the trial court during sentencing. Id.
Thereafter, this court vacated its previously issued stay order and remanded the case to the district court. State v. Jones, 634 So.2d 838 (La.1994). The order indicated the case could proceed to trial upon the district attorney's stipulation that he would forego use of LSA-C.Cr.P. art. 905.2(B). Id. The order further indicated that if the district attorney chose not to forego use of LSA-C.Cr.P. art. 905.2(B), he should notify this court of his decision, in which case this court would stay trial, grant defendant's application and assign the case for oral argument. Id. When the district attorney decided not to forego use of LSA-C.Cr.P. art. 905.2(B), we granted defendant's writ application. State v. Jones, 634 So.2d 845 (La.1994).

II.
Defendant's writ application does not seek an advisory opinion on the constitutionality of LSA-C.Cr.P. art. 905.2(B). See generally American Waste & Pollution Control Co. v. St. Martin Parish Police Jury, 627 So.2d 158 (La.1993). Instead, it provokes employment of our supervisory jurisdiction and plenary authority to consider the constitutionality of a capital sentencing provision which the law requires the trial court to implement in all capital sentencing hearings, and which the state declined to forego commenting on in the guilt and/or sentencing phases of trial. LSA-Const. Art. 5, § 5. See State v. Peart, 621 So.2d 780, 790-791 (La.1993). Cf. State v. Jackson, 608 So.2d 949 (La.1992); State v. Bernard, 608 So.2d 966 (La.1992). Thus, since a death sentence is qualitatively different from any other sentence and we have a duty to ensure against arbitrary imposition of the death penalty, we invoke our plenary authority to evaluate the constitutionality of LSA-C.Cr.P. art. 905.2(B) at this stage, rather than unnecessarily chancing retrial of a capital case. See LSA-Const. Art. 5, § 5; Supreme Court Rule 28, § 1; LSA-C.Cr.P. art. 905.9.

III.
In Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the United States Supreme Court recognized that the penalty of death is different in kind from any other punishment imposed under the American criminal justice system. Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). Because of the uniqueness of the death penalty, Furman holds that it could not be imposed under sentencing procedures which created a substantial risk that it would be inflicted in an arbitrary and capricious manner. Id. Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, Furman mandates that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action. 428 U.S. at 188-189, 96 S.Ct. at 2932. To minimize the risk that the death penalty will be imposed on a capriciously selected group of offenders, the decision to impose death has to be guided by standards so that the sentencing authority will focus on the particularized circumstances of the crime and the defendant. 428 U.S. at 199, 96 S.Ct. at 2937.
In 1974, in the case of Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), the United States Supreme Court held Louisiana's death penalty scheme then in effect failed to provide a constitutionally adequate response to Furman. State v. Sonnier, 379 So.2d 1336, 1370 (La.1979), on re'hrg. However, on the same day Roberts was rendered, the United States Supreme Court approved the bifurcated capital sentencing procedure it reviewed in Gregg v. Georgia, supra, which divided capital trials into a guilt phase and a sentencing phase. Id. Among other procedures, Georgia's bifurcated scheme required the jury in the sentencing phase to consider the circumstances of the crime and the criminal before recommending a sentence of death. In Gregg, the United States Supreme Court expressly commented that such a procedure directed the jury's attention to the specific circumstances of the crime and focussed its attention on the characteristics of the person *1148 who committed the crime. It found, as a result, "while jury discretion still exists, `the discretion to be exercised is controlled by clear objective standards so as to produce non-discriminatory application.'" 428 U.S. at 197-198, 96 S.Ct. at 2936, citing Coley v. State, 231 Ga. 829, 834, 204 S.E.2d 612, 615 (1974).
In 1976, Louisiana amended its capital sentencing scheme, modeling it after the Georgia scheme approved in Gregg. State v. Sonnier, 379 So.2d at 1370. See LSA-C.Cr.P. arts. 905-905.9; Supreme Court Rule 28, § 1. The adopted scheme specifies that a sentence of death may only be imposed after the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and after consideration of any mitigating circumstances. LSA-C.Cr.P. art. 905.3. The sentencing hearing is required to focus on the circumstances of the offense and the character and propensities of the offender. LSA-C.Cr.P. art 905.2. Every sentence of death is then reviewed by this court to determine if it is excessive. LSA-C.Cr.P. art. 905.9; Supreme Court Rule 28, § 1.
After these sentencing procedures were in place, this court noted that the possibility of pardon or commutation was quickly becoming a major issue in Louisiana's capital sentencing hearings. State v. Lindsey, 404 So.2d 466, 485 (La.1981), cert. den., 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246, re'hg den., 464 U.S. 1004, 104 S.Ct. 515, 78 L.Ed.2d 702 (1983). This generated concern because the injection of such factors into the sentencing phase of a capital trial diverts the jurors from their primary responsibility, charges them to make decisions not proper within their duty as jurors (by speculating what a present or future governor may do) and creates a substantial likelihood that the death penalty will be imposed as a product of arbitrary factors. Id.
Since the sentencing scheme then in effect did not expressly provide for the jury's consideration of a pardon and commutation and, more importantly, because the purposeful injection of comments on pardon and commutation provokes the jury to speculate about future actions of governors, induces the jury to consider whether the present or a future governor would improperly pardon or commute a sentence (thereby pre-empting the governor's power and unconstitutionally invoking the death penalty to defeat the constitutional design of the pardon power), and motivates the jury to act out of fear of the unknown possibility that the defendant may be returned to society, we implemented an almost blanket prohibition of discussion of such matters. See 404 So.2d at 486-487. Consequently, based upon the magnitude of the potential for arbitrary jury decision making and the irrelevance of clemency to the jury's duty in a capital sentencing hearing, we held that,
conditions under which a person sentenced to life imprisonment without benefit of parole, probation or suspension of sentence can be released at some point in the future is not a proper consideration for a capital sentencing jury and shall not be discussed in its presence. Should a jury request information concerning the possibility of an offender's release, it must be informed that it is duty bound to disregard how other governmental bodies may, in their wisdom and subject to other constraints, act but, instead, must concentrate upon whether it presently feels, in light of the offender and the nature of the offense, the offender should be sentenced to death or to spend the remainder of his life in prison. 404 So.2d at 482. (emphasis added)
See also State v. Willie, 410 So.2d 1019, 1033 (La.1982) [an argument based on the law governing pardon and commutation or its administration by the governor and other executive officers is entirely inappropriate to a capital sentencing proceeding]; State v. Copeland, 419 So.2d 899 (La.1982); State v. Jordan, 420 So.2d 420 (La.1982); State v. Sawyer, 422 So.2d 95, n. 20 (La.1982) ["Prosecutors tread on dangerous ground by mentioning the availability of pardon. Even though such a remark is accurate, it has little relevance to the penalty determination, except to give the jury a complete picture of the overall scheme for punishing first degree murderers ..."], cert. granted, judgment vacated and case remanded, 463 U.S. 1223, 103 S.Ct. 3567, 77 L.Ed.2d 1407 (1983), aff'd on *1149 remand, 442 So.2d 1136 (La.1983); State v. Kirkpatrick, 443 So.2d 546 (La.1983), cert. den., 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984); State v. Glass, 455 So.2d 659 (La.1984), cert. den., 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985), re'hrg den., 472 U.S. 1033, 105 S.Ct. 3516, 87 L.Ed.2d 645 (1985); State v. Williams, 490 So.2d 255 (La.1986), cert. den., 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987), re'hrg den., 483 U.S. 1056, 108 S.Ct. 32, 97 L.Ed.2d 820 (1987).
Against this backdrop, the legislature enacted Act 436 of 1993, adding section (B) to LSA-C.Cr.P. art. 905.2 and its requirement for the trial court to instruct the jury regarding the gubernatorial clemency power. As amended, LSA-C.Cr.P. art. 905.2 provides as follows:
Art. 905.2. Sentencing hearing; procedure and evidence; jury instructions
A. The sentencing hearing shall focus on the circumstances of the offense and the character and propensities of the offender. The hearing shall be conducted according to the rules of evidence. Evidence relative to aggravating or mitigating circumstances shall be relevant irrespective of whether the defendant places his character at issue. Insofar as applicable, the procedure shall be the same as that provided for trial in the Code of Criminal Procedure. The jury may consider any evidence offered at trial on the issue of guilt. The defendant may testify in his own behalf. In the event of retrial the defendant's testimony shall not be admissible except for purposes of impeachment.
B. Notwithstanding any provisions to the contrary, the court shall instruct the jury that under the provisions of the state constitution, the governor is empowered to grant a reprieve, pardon, or commutation of sentence following conviction of a crime, and the governor may, in exercising such authority, commute or modify a sentence of life imprisonment without benefit of parole to a lesser sentence including the possibility of parole, and may commute a sentence of death to a lesser sentence of life imprisonment without benefit of parole. The court shall also instruct the jury that under this authority the governor may allow the release of an offender either by reducing a life imprisonment or death sentence to the time already served by the offender or by granting the offender a pardon. The defense may argue or present evidence to the jury on the frequency and extent of use by the governor of his authority.
As previously indicated, prior to the enactment of Act 436 of 1993 and the addition of section (B) to LSA-C.Cr.P. art. 905.2, the constant focus of the sentencing phase of a capital trial was on the circumstances of the offense or on the character and propensities of the offender. See State v. Bernard, supra. The constitutionally challenged statute must, therefore, be examined to ascertain whether it impermissibly shifts the focus of the sentencing hearing, skewing the decision making process and, thereby, denying defendant a fundamentally fair trial in violation of due process of law, and/or whether it creates a risk that the jury will abuse its discretion by recommending death for an arbitrary reason, when it otherwise would have recommended a lesser sentence, in violation of the guarantee of humane treatment.

IV.
A pardon is a matter of grace. Bryant v. Louisiana State Pardon Board, 378 So.2d 180 (La.App. 1st Cir.1979); Bedau, Hugo Adam, A Retributive Theory of the Pardoning Power?, 27 U.Rich.L.Rev. 185, 191 (1993) ["executive clemency is a power of mercy and the sentence reduction it provides are merciful acts"]; Vandirer, Margret, The Quality of Mercy: Race and Clemency in Florida Death Penalty Cases, 1924-1966, 27 U.Rich. L.Rev. 315, 316, 318 (1993). It is reminiscent of the king's prerogative to decide whether a condemned person lived or died. Kobil, Daniel T., Due Process in Death Penalty Commutations: Life, Liberty, and the Pursuit of Clemency, 27 U.Rich.L.Rev. 201, 202 (1993). The power of clemency is deeply rooted in our Anglo-American tradition of law, and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted. Herrera v. Collins, ___ U.S. ___, 113 S.Ct. 853, 122 L.Ed.2d 203 *1150 (1993). Nonetheless, like the monarchial power from which it derives, clemency is shrouded in mystery and often fraught with arbitrariness. Kobil, 27 U.Rich.L.Rev. at 202.
The executive clemency power can be and, admittedly, has been misused by the granting or denying of pardons, commutations and reprieves based on political motivations or favoritism. See Wardlaw, Jack and Lynch, Bill, "Edwards: Turned Down Offers to Buy Pardons for Prisoners," Times-Picayune (September 24, 1986); Wardlaw, Jack, "Two Indicted in Pardon Bribe Case," Times-Picayune (September 7, 1986) [Rep. Joseph A. Delpit, speaker pro tem of the House, and Pardon Board Chairman Howard A. Marsellus, Jr., indicted on bribery charges for allegedly attempting to sell a pardon for a convicted murderer for $130,000]; Hargroder, Charles M. "Sudden Twist in Marsellus Case," Times-Picayune (October 6, 1987) [former chairman of the Louisiana Pardon Board, Marsellus, plead guilty to charges that he sold clemency to state prison inmates]; Associated Press, "Pardons Rise as Edwards Term Ends," Times-Picayune (February 14, 1988); Scheinfeld, David, "Second Chances," 201 New York Law Journal p. 2, col. 3 (January 31, 1989) [ex-president Ford pardoned an attorney jailed for obstruction of justice; the forgiven attorney's brother was a major Republican political contributor]; Lichfield, John, "No Deliverance in Virginia," The Independent p. 16 (May 10, 1992) [a Virginia death row inmate whose proof of innocence was discovered 21 days after his conviction and whose execution was scheduled for the following week, replied as follows when questioned regarding his hope of receiving a gubernatorial pardon: "That's the one question I never answer because the death penalty is political and he's a politician."] However, that power is also validly exercised in cases where newly-discovered evidence establishes innocence, where changes in the prisoner demonstrate the justice of commutation (such as the prisoner is terminally ill or has been rehabilitated), where the prisoner had moral justification for the criminal act (such as battered women's syndrome), where the prisoner was not wholly at fault in committing the criminal act (such as it was committed under circumstances of insanity, mental retardation, or youth), where the imposed penalty is considered unduly harsh, and/or where a pardon will heal political wounds. See generally Bedau, 27 U.Rich.L.Rev. 185; Ledewitz, Bruce and Staples, Scott, The Role of Executive Clemency in Modern Death Penalty Cases, 27 U.Rich.L.Rev. 227 (1993); "A Matter of Life and Death: Due Process Protection in Capital Clemency Proceedings," 90 Yale L.J. 889 (1981); Schimmel, Joseph B., Commutations of the Death Sentence: Florida Steps Back From Justice and Mercy, 20 Fla. S.U.L.Rev. 253 (1992); Adams, Edward A., "Cuomo Faces Annual Ritual of Deciding on Clemency," 208 New York Law Journal p. 1, col. 3 (December 28, 1992).
Louisiana's gubernatorial clemency power, which encompasses reprieves, pardons, commutations of sentences and the restoration of full rights of citizenship, is bestowed by the constitution. It is purely a function of the executive branch of government, not subject to limitation or control from the other branches. Bryant v. Louisiana State Pardon Board, supra.; State v. Mehojovich, 119 La. 791, 44 So. 481 (1907). Article 5, § 4(E)(1) of the Louisiana Constitution of 1974 provides that the governor may grant reprieves to persons convicted of offenses against the state and, upon recommendation of the Board of Pardons,[4] may commute sentences, pardon those convicted of offenses against the state, and remit fines and forfeitures imposed for such offenses. See also LSA-R.S. 15:572 et seq. Except for requests for reprieve, the governor can only act on requests for clemency upon recommendation made by the pardon board. LSA-Const. Art. 5, § 5(E)(1). The governor's decision is dispositive. There is no right of appeal from his or her decision.
In the last twenty years, a Louisiana governor has commuted only one death sentence to life imprisonment. On August 17, *1151 1989, Governor Buddy Roemer, following the recommendation of the Board of Pardons, commuted the sentence of Ronald S. Monroe stating: "While there is guilt for Ronald Monroe, in an execution in this country, the test ought not be reasonable doubt, the test ought to be is there any doubt." Radelet, Michael L. and Zsembik, Barbara A., Executive Clemency in Post-Furman Capital Cases, 27 U.Rich.L.Rev. 289, 312-313 (1993). In contrast, during this same time period, 170[5] commutations have been granted to inmates sentenced to life imprisonment for first degree murder.

V.
The constitutionality of LSA-C.Cr.P. art. 905.2(B) raises issues pertaining to the fundamental provisions of both the Louisiana and federal constitutions. Principles of jurisprudence, efficiency and federalism dictate that the appropriate procedure for deciding the constitutionality of the state statute is by analyzing the provisions of our constitution before those of the federal constitution.[6]State v. Perry, 610 So.2d 746, 750 (La.1992). Cf. California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983); Simmons v. South Carolina, ___ U.S. ___, ___, 114 S.Ct. 2187, 2196, 129 L.Ed.2d 133 (1994) ["It is true that Ramos stands for the broad proposition that we generally defer to a State's determination as to what a jury should and should not be told about sentencing... States reasonably may conclude that truthful information regarding the availability of commutation, pardon, and the like, should be kept from the jury in order to provide `greater protections in [the States'] criminal justice system than the Federal Constitution requires." Citing California v. Ramos, 463 U.S. at 1014, 103 S.Ct. at 3460.].

VI.
Death as a punishment is in a class by itself. Furman v. Georgia, 408 U.S. at 289, 92 S.Ct. at 2752 (Brennan, J., concurring). It is unique in its severity and its irrevocability. Gregg v. Georgia, 428 U.S. at 185-87, 96 S.Ct. at 2931; Furman v. Georgia, 408 U.S. at 286-291, 92 S.Ct. at 2750-2753 (Brennan, J., concurring); 408 U.S. at 306, 92 S.Ct. at 2760 (Stewart, J., concurring). Death remains the only punishment that may involve the conscious infliction of physical pain. Furman v. Georgia, 408 U.S. at 288, 92 S.Ct. at 2751 (Brennan, J., concurring). Hence, we fully subscribe to the United States Supreme Court's observation that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of capital sentencing *1152 determinations (and procedures). California v. Ramos, 463 U.S. 992, 998, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171 (1983). Therefore, because it involves the constitutionally guaranteed rights of a capital defendant, the evaluation of the constitutionality of LSA-C.Cr.P. art. 905.2(B) requires a heightened degree of scrutiny.

A. Due Process Right to a Fundamentally Fair Trial
LSA-Const. Art. 1, § 2 declares that no person shall be deprived of life, liberty, or property, except by due process of law. The broad safeguards of this provision encompass the guarantee of fundamental fairness in the sentencing phase of a capital trial and in the decision making process from which the penalty results. A sentencing hearing procedure which influences or predisposes a jury to sentence a defendant to death, when it otherwise would not, is fundamentally unfair in violation of due process guarantees.
The possibility of reprieve, pardon or commutation bears no relevant relationship to the constitutionally required focus of the capital sentencing hearing which properly is the circumstances of the offense and the character and propensities of the offender. The irrelevant instruction required by LSA-C.Cr.P. art. 905.2(B), injects a factor into the jury's decision making process which is arbitrary. The factor is arbitrary because it invites the jury to engage in irrelevant speculation of what the present or an unknown future governor will do at an unknown point in the future in response to a request by an unknown person to pardon defendant based upon unknown reasons. In short, it asks for a present answer to uncertain future events, provoking questions which no human mind can answer. State v. Lindsey, 404 So.2d at 486. In doing so, it diverts the jury from its proper purpose and it invites the jury to impose a death sentence on the basis of its ad hoc speculation about the likelihood of defendant's eventual release. California v. Ramos, 463 U.S. at 1019, 103 S.Ct. at 3463 (Marshall, J., dissenting). As we stated in State v. Lindsey,
when a jury's attention is diverted from its primary responsibility of weighing the circumstances of the crime and the character and propensities of the offender and thrust into speculation about the future actions of yet unknown actors, a serious possibility arises that each death sentence imposed under such conditions is the result of an interjection of an unquantifiable factor into the deliberation process, thereby rendering the decision arbitrary ... 404 So.2d at 487.
Under the required clemency instruction, one capital defendant may be sentenced to death and another to life imprisonment merely because one jury perceived the system provided a greater likelihood of commutation (with the consequence of parole) than did the other juryan arbitrary factor unconnected to the offense or offender. A recommendation of death based on a jury prediction of the likelihood defendant will eventually be released if not sentenced to death, is an arbitrary and capricious decision lacking in fundamental fairness. California v. Ramos, 463 U.S. at 1020, 103 S.Ct. at 3463 (Marshall, J., dissenting). The gubernatorial pardoning power is plainly not a meaningful, principled basis for distinguishing a case in which the death penalty should be imposed from one in which it should not. See Id.; 463 U.S. at 1020-1021, 103 S.Ct. at 3463-3464. Rather than purposely diverting the jury's focus to arbitrary factors, the trial court should channel its discretion to focus on the defendant's character and the nature of the crime, factors which minimize the risk of capricious imposition of the death penalty. By deterring the capital jury from this goal and marring its focus, LSA-C.Cr.P. art. 905.2(B) impermissibly increases the risk of an arbitrary factor affecting the jury's sentencing recommendation and, therefore, it compromises the reliability of the jury's decision making process.
The clemency instruction also tends to diminish the jury's sense of responsibility for its action. Ramos II, 207 Cal.Rptr. at 813, 689 P.2d at 443. When the jury is informed of the possibility of commutation, reprieve and pardon, the information may cause the jury to avoid its responsibility under the notion that, if it mistakenly fails to recommend mercy, the error may be corrected by the governor. See Id. citing Smith v. State, *1153 317 A.2d 20, 25 (Del.1974). The instruction then obscures the lines separating the judicial and executive powers by inducing the jury to fail to make the proper constitutionally ordained determination in the first instance, upon a belief that it will subsequently be handled by others. See People v. Ramos, 30 Cal.3d 553, 180 Cal.Rptr. 266, 289-90, 639 P.2d 908, 932 (1982) (Ramos I), cert. granted and rev'd, California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). The risk of improperly diminishing the jury's sense of responsibility by injecting thoughts of clemency is too great a hazard to chance since, through it, the punishment of death may be inflicted in error.
Purposeful injection of the clemency issue blurs the constitutional separation of powers in yet another manner, by inviting the jury to pre-empt the governor's commutation power by opting for the death sentence to minimize or to thwart the governor's use of the power. Such a jury action would defeat the constitutional design of both the clemency power and the right of due process of law. See State v. Lindsey, 404 So.2d at 487; Ramos II, 207 Cal.Rptr. at 813, 689 P.2d at 443. The constitution grants the clemency power to the governor, while the function of the capital jury is solely to sentence defendant based on the circumstances of the offense and the character and propensities of the offender. The jury should not be induced to foreclose the executive branch from subsequently deciding the commutation (and parole) issue(s). People v. Morse, 60 Cal.2d 631, 36 Cal.Rptr. 201, 209, 388 P.2d 33, 41 (1964).
A risk created by pre-emption of the gubernatorial clemency power of even greater constitutional dimension, is the jury's apprehension of misuse of the power could inspire it to frustrate the constitution's clemency scheme by recommending defendant be sentenced to death when it would have otherwise recommended a sentence of life-imprisonment. See State v. Lindsey, 404 So.2d at 487; Ramos II, 207 Cal.Rptr. at 813, 689 P.2d at 443. The sentence of death, then, is not the punishment defendant deserves but is a reactive punishment to stymie the clemency power. Due process is violated by a capital sentencing instruction which invites the jury to speculate if the executive branch will misuse its clemency power. People v. Morse, 36 Cal.Rptr. at 208-10, 388 P.2d at 40-41. Violation of due process is compounded when, as a result of such speculation, the jury recommends the punishment of death. The jury's duty is to decide its recommendation based upon present facts, what happens after the recommended sentence is imposed is simply not its concern. Id.
Finally, the instruction is not one with a neutral effect. Defendant's due process right to a fundamentally fair capital sentencing hearing requires that he should not be placed in the defensive position of having to overcome any negative impact of the clemency power jury instruction. Defendant should not be forced to defensively respond to the irrelevant instruction in order to persuade or reassure the jury that he has little hope of obtaining a commutation (i.e., he is without political clout, his history would not make him a likely candidate for commutation, or he is unlikely to be rehabilitated, educated or to become terminally ill).
Based on the foregoing reasons, we hold LSA-C.Cr.P. art. 905.2(B), which requires a capital jury to be instructed on the governor's clemency power, unconstitutionally violates the due process guarantee of a fundamentally fair trial. LSA-Const. Art. 1, § 2. The possible prejudicial effect of the instruction perniciously undermines the reliability of the capital sentencing hearing and the soundness of the process by which a jury arrives at the recommendation of death. It purposefully injects an irrelevant, arbitrary factor into the sentencing hearing risking speculation and chancing the recommendation of the death from a capital jury lacking confidence in governor's ability to wisely use the clemency power. See Ramos II, 207 Cal.Rptr. at 813, 689 P.2d at 443. Injecting this arbitrary factor into the capital sentencing process undermines the fundamental fairness requisite for the capital hearing, a hearing which requires a greater degree of scrutiny due to the qualitative difference between the death penalty from other statutory punishments.

B. Right to Humane Treatment
Louisiana's constitutional right to humane treatment is embodied in LSA-Const. Art. 1, *1154 § 20, which declares that no law shall subject any person to cruel, excessive or unusual punishment. A source of this right is the Cruel and Unusual Punishments Clause of the Eighth Amendment of the federal constitution. The Eighth Amendment requires increased reliability of the process by which capital punishment may be imposed. Herrera v. Collins, supra, ___ U.S. at ___, 113 S.Ct. at 863. It exacts that capital sentencing procedure must facilitate the responsible and reliable exercise of sentencing discretion. Caldwell v. Mississippi, 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985). The more significant function of the Clause, however, is to protect against the danger of arbitrary infliction of an unusually severe punishment. Furman v. Georgia, 408 U.S. at 277, 92 S.Ct. at 2746 (Brennan, J., concurring). It forbids the judicial imposition of a cruel and unusual punishment. Furman v. Georgia, 408 U.S. at 241, 92 S.Ct. at 2728 (Douglas, J., concurring). It entitles a defendant to a jury capable of a reasoned moral judgment about whether death, rather than some lesser sentence, ought to be imposed. Simmons v. South Carolina, ___ U.S. ___, 114 S.Ct. at 2198 (Souter, J., concurring).
Our state constitutional right to humane treatment embodies these Eighth Amendment principles. Moreover, the inclusion in our constitution of the prohibition against "excessive" punishment adds a protection which surpasses those provided by the federal constitution. See State v. Perry, 610 So.2d at 762. The "cruel and unusual" punishment prohibition condemns the arbitrary infliction of severe punishment. State v. Perry, 610 So.2d at 763. The prohibition against "excessiveness" proscribes punishment which does not make any measurable contribution to the goals the punishment is intended to achieve, or is grossly out of proportion to the severity of the crime. State v. Perry, 610 So.2d at 764; State v. Labato, 603 So.2d 739, 751 (La.1992); State v. Bonanno, 384 So.2d 355 (La.1980). A punishment that is disproportionate to the offense and the offender is unnecessarily severe and, therefore, excessive per se. Thus, under LSA-Const. Art. 1, § 20, in addition to entitlement to heightened reliability of the capital sentencing process, the provision protects all defendants not only from punishments that are cruel, excessive or unusual per se or as applied to particular categories of crimes or classes of offenders, but also from any excessive feature of a particular sentence produced by an abuse of the sentencer's discretion, even though the sentence is otherwise within constitutional limits. State v. Perry, 610 So.2d at 764; State v. Telsee, 425 So.2d 1251 (La.1983).
A sentence of death imposed for any reason other than the penalty is particularized to the circumstances of the crime and the character and propensities of the defendant, is arbitrarily severe, unnecessarily cruel, and disproportionate to the offense. Hence, if a jury instruction creates speculation and fear sufficient to overcome the jury's feelings of compassion or mercy, or predisposes it to recommend an unnecessarily severe punishment and, as a consequence, the jury recommends the sentence of death when it otherwise would not, the punishment of death is disproportionate to the severity of the crime and unconstitutionally excessive. The punishment of death would then violate the defendant's right to humane treatment as it is not the punishment defendant deserves.
Like the Cruel and Unusual Punishments Clause, LSA-Const. Art. 1, § 20 imposes a heightened standard for reliability in the determination that death is the appropriate punishment in a specific case and it invalidates procedural rules which tend to diminish reliability of the sentencing determination. Simmons v. South Carolina, ___ U.S. at ___, 114 S.Ct. at 2198 (Souter, J., concurring), citing Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991-92, 49 L.Ed.2d 944 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) and Beck v. Alabama, 447 U.S. 625, 638, 100 S.Ct. 2382, 2390, 65 L.Ed.2d 392 (1980). Without belaboring the reasons made in the previous section supporting the conclusion that the clemency power instruction misguides the jury's deliberations by deterring its focus from the circumstances of the offense and the character and propensities of the offender through the injection of an arbitrary factor thereby creating a substantial risk that the penalty of *1155 death will be inflicted for an arbitrary and capricious reason, we hold LSA-C.Cr.P. art. 905.2(B) is unconstitutional in violation of the right to humane treatment.
LSA-Const. Art. 1, § 20 is a constitutional check on the legislature's latitude to pass capital sentencing guidelines. See Furman v. Georgia, 408 U.S. at 257-306, 92 S.Ct. at 2736-2760 (Brennan, J., concurring). The clemency power jury instruction creates the impermissible risk that the death penalty will be recommended when the penalty is not the one defendant deserves and when it is disproportionate to the severity of the crime. Because the instruction undercuts the soundness of the capital jury's decision making process and undermines the reliability of any resultant recommendation of death, LSA-C.Cr.P. art. 905.2(B) cannot stand.

VII.
The heightened constitutional protections afforded capital defendants combined with the mandates of LSA-Const. Art. 1, § 2 and § 20, restrain the freedom of the legislature from enacting legislation which undermines the fundamental fairness of a capital sentencing hearing and/or promotes the infliction of cruel, excessive and unusual punishment. Based on the overpowering need for reliability in the determination of a death sentence, a punishment unique in its severity and irrevocability, the invalidation of LSA-C.Cr.P. art. 905.2(B) is necessary. Therefore, the statute, as amended by Act 436 of 1993, is unconstitutional and unenforceable.
Based on the foregoing, the ruling of the district court on defendant's motion in limine is reversed, the motion is granted and the case is remanded to the district court for further proceedings.
REVERSED AND REMANDED.
LEMMON, J., subscribes to the opinion and assigns additional reason.
MARCUS, J., dissents and assigns reasons.
KIMBALL, J., concurs in the result and will assign reasons.
LEMMON, Justice, Subscribing to the Opinion and Assigning Additional Reasons
I agree that La.Code Crim.Proc. art. 905.2B, which requires that the trial judge instruct the jury in every capital case on the governor's pardon and commutation powers, must be declared unconstitutional. This court has consistently held that such an instruction generally will introduce an arbitrary factor into the jury's sentencing decision. See State v. Lindsey, 404 So.2d 466 (La.1981).
This is not to say that such an instruction should never be given. Perhaps the defense attorney or the prosecutor will make a statement during closing argument that necessitates clarification by a jury instruction, compare Simmons v. South Carolina, ___ U.S. ___, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), or perhaps a request by the jury will give rise to such a need. These questions must be decided on a case-by-case basis and are beyond the scope of the narrow issue presently before the court. Nevertheless, the trial judge flirts with reversible error when he or she mentions pardon powers and should be very cautious in handling such situations.
MARCUS, Justice (dissenting).
In California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), the Supreme Court made it clear that an instruction regarding the governor's power to commute was not prohibited by the Eighth and Fourteenth Amendments to the U.S. Constitution. Recently, in Simmons v. South Carolina, ___ U.S. ___, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the Court again stated that "nothing in the Constitution prohibits the prosecution from arguing any truthful information relating to parole or other forms of early release."
I see no significant difference between the articles of our constitution and the federal constitution in the area of cruel and unusual punishments. Since this instruction would pass muster under the U.S. Constitution, it should not be prohibited under our state constitution. Accordingly, I respectfully dissent.
*1156 KIMBALL, Justice, concurring in result.
I write separately because although I agree with the result achieved by the majority's opinion, I respectfully disagree in part with the analysis employed by the majority in reaching that result.
I disagree with the majority's implication that the due process clause of the Louisiana Constitution provides broader protection than the virtually identical Due Process Clause of the United States Constitution.[1] In my view, the jury instruction required by La.C.Cr.P. art. 905.2(B)[2] violates the defendant's due process rights under both constitutions.
In Simmons v. South Carolina, 114 S.Ct. 2187 (1/18/94), the United States Supreme Court held the State of South Carolina denied the defendant due process under the federal constitution when the trial court refused the defendant's request to instruct the jury that "life imprisonment" did not carry with it the possibility of parole. The Supreme Court found the refusal to so instruct the jury "had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." Id. at 2193. Under Simmons, therefore, federal due process requires trial courts to instruct juries regarding parole ineligibility because to do otherwise would skew the jury toward imposing death.
In the instant case, the requirement that the jury be instructed to consider the possibility of a reprieve, pardon, or commutation of defendant's sentence presents a situation which is analogous to that in Simmons. Like the trial court's refusal to instruct the jury that "life imprisonment" did not carry with it the possibility of parole in Simmons, the jury instruction required by La.C.Cr.P. art. 905.2(B) would serve only to raise in the minds of jurors the possibility of defendant's early release and to create "a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." Simmons, supra at 2193. Therefore, because federal due process under Simmons requires trial courts to instruct juries regarding parole ineligibility where to do otherwise would skew the jury toward imposing death, federal as well as state due process likewise requires trial courts to refrain from instructing juries regarding executive clemency where to do otherwise would skew the jury toward imposing death. In other words, in my view the rule of Simmons broadens the due process protection afforded by the federal Constitution beyond that previously recognized in California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).[3]
Thus, while I agree with the majority's observation that "[t]he possible prejudicial effect of the instruction perniciously undermines the reliability of the capital sentencing hearing and the soundness of the process by which a jury arrives at the recommendation of death," I would emphasize that the instruction *1157 violates the due process guarantee of a fundamentally fair trial under both the United States and Louisiana Constitutions.
Additionally, I disagree with the inclusion of what I consider unnecessary analysis of La.C.Cr.P. art. 905.2(B) under the cruel and unusual punishment clauses of the state and federal constitutions.[4] Having declared La. C.Cr.P. art. 905.2(B) unconstitutional as a violation of defendant's due process right to a fair trial, I believe the majority should have adhered to the longstanding rule that a court will not consider constitutional challenges unless essential to the decision of the case or controversy. White v. West Carroll Hosp., Inc., 613 So.2d 150, 157 (La.1992); Benson & Gold Chevrolet, Inc. v. Louisiana Motor Vehicle Comm'n, 403 So.2d 13, 23 (La.1981); State v. Stripling, 354 So.2d 1297, 1300 (La. 1978); State v. Cryer, 262 La. 575, 263 So.2d 895, 898 (1972); Tafaro's Investment Co. v. Division of Housing Improvement, 261 La. 183, 259 So.2d 57, 59 (1972); Aucoin v. Dunn, 255 La. 823, 233 So.2d 530, 531 (1970).
For the foregoing reasons, I respectfully concur.
NOTES
[1] Judge Melvin A. Shortess, Court of Appeal, First Circuit, sitting in place of Justice James L. Dennis. Pursuant to Rule IV, Part 2, § 3, Watson, J., is not on the panel which heard and decided this case.
[2] The portion of LSA-C.Cr.P. art. 905.2 added by Act 436 of 1993 provides as follows:

Art. 905.2. Sentencing hearing; procedure and evidence; jury instructions
* * * * * *
B. Notwithstanding any provisions to the contrary, the court shall instruct the jury that under the provisions of the state constitution, the governor is empowered to grant a reprieve, pardon, or commutation of sentence following conviction of a crime, and the governor may, in exercising such authority, commute or modify a sentence of life imprisonment without benefit of parole to a lesser sentence including the possibility of parole, and may commute a sentence of death to a lesser sentence of life imprisonment without benefit of parole. The court shall also instruct the jury that under this authority the governor may allow the release of an offender either by reducing a life imprisonment or death sentence to the time already served by the offender or by granting the offender a pardon. The defense may argue or present evidence to the jury on the frequency and extent of use by the governor of his authority.
[3] Defendant has two prior convictions for armed robbery which presently are on appeal to the Fourth Circuit Court of Appeal, in State v. Lester Jones, No. 94-KA-0071. Defendant also has two charges of armed robbery presently pending against him in the Criminal District Court, Parish of Orleans, in State v. Lester Jones, No. 358-749(B).
[4] The Constitution directs that the "Board of Pardons shall consist of five electors appointed by the governor, subject to confirmation by the Senate. Each member of the board shall serve a term concurrent with that of the governor appointing him." LSA-Const. Art. 4, § 5(E)(2).
[5] A compilation by Thomas A. Hollins, Administrative Specialist II, Louisiana Board of Pardons, indicates that the following number of commutations for first degree murder were signed: 19742, 19751, 197626, 197726, 197811, 197926, 19808, 19810, 19821, 19831, 19849, 19854, 198614, 19879, 198818, 19897, 19907, 19915, 19924, 19930, 19940 (as of January 27, 1994), totalling 179. Hollins indicated these figures included one death sentence commutation and eight commutations for persons re-sentenced by the courts from death to life, thereby reducing the total to 170. He additionally noted that only eleven commutations specifically stated first degree murder; all others only stated murder.

Accord: A memorandum from the Louisiana Department of Public Safety & Corrections, dated August 17, 1993, indicates that in 1991 the sentences of 5 inmates convicted of first degree murder were commuted from life sentences (average time served on life prior to commutation 16.9 years) and in 1992 the sentences of 4 inmates convicted of first degree murder were commuted from life sentences (average time served on life prior to commutation 16.5 years).
[6] California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), held that California's "Briggs instruction" did not violate the Eighth and Fourteenth Amendments to the United States Constitution. By California law, the Briggs instruction required the trial court to inform the capital jury during the penalty phase of trial that a sentence of life imprisonment without the possibility of parole may be commuted by the governor to a sentence that includes the possibility of parole. Unlike LSA-C.Cr.P. art. 905.2(B), the Briggs instruction did not inform the jury that the governor possesses the power to commute a death sentence. On remand from the United States Supreme Court, the California Supreme Court in People v. Ramos, 37 Cal.3d 136, 207 Cal.Rptr. 800, 811, 689 P.2d 430, 441 (1984) (Ramos II), held the Briggs instruction violated California's constitutional guarantee of due process and held that even if the instruction was amended to inform the jury that the governor possesses the power to commute a death sentence, it would violate California's constitutional guarantee of due process.
[1] U.S. Const. Art. XIV, § 1 provides in pertinent part that no State shall "deprive any person of life, liberty, or property, without due process of law."

La. Const. art. 1, § 2 provides: "No person shall be deprived of life, liberty, or property, except by due process of law."
[2] La.C.Cr.P. art. 905.2(B) provides:

B. Notwithstanding any provision to the contrary, the court shall instruct the jury that under the provisions of the state constitution, the governor is empowered to grant a reprieve, pardon, or commutation of sentence following conviction of a crime, and the governor may, in exercising such authority, commute or modify a sentence of life imprisonment without benefit of parole to a lesser sentence including the possibility of parole, and may commute a sentence of death to a lesser sentence of life imprisonment without benefit of parole. The court shall also instruct the jury that under this authority the governor may allow the release of an offender either by reducing a life imprisonment or death sentence to the time already served by the offender or by granting the offender a pardon. The defense may argue or present evidence to the jury on the frequency and extent of use by the governor of his authority.
[3] Justice Scalia recognized the broadening of due process protection implied by the majority opinion in Simmons when he stated in dissent: "Preventing the defense from introducing evidence regarding parolability is only half of the rule that prevents the prosecution from introducing it as well. If the rule is changed for defendants, many will think that evenhandedness demands a change for prosecutors as well." Simmons, supra 114 S.Ct. at 2203 (Scalia, J., dissenting).
[4] U.S. Const. Amend. VIII prohibits "cruel and unusual punishments," while La. Const. Art. I, § 20 prohibits "cruel, excessive, or unusual punishment."